UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

ABDULMALEK AL-SABAHI,                    :

                    Petitioner,    :    10 Civ. 5748 (DAB)(HBP)

     -against-                     :    REPORT AND
                                        RECOMMENDATION
VINCENT N. SCHIRALDI,              :
Superintendent, New York City
Department of Probation, et al.,   :

                    Respondents.   :

-----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE DEBORAH A. BATTS, United States

District Judge,

I.  Introduction

          Petitioner Abdulmalek Al-Sabahi seeks, by a petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, an

Order vacating a judgment of conviction imposed on January 4,

2008, after a jury trial, by the Supreme Court of the State of

New York, New York County (Gibbons, J.), for three counts of

sexual abuse in the second degree, in violation of New York Penal

Law Section 130.60(2) (Petition for a Writ of Habeas Corpus,

filed Jul. 29, 2010 (Docket Item 2)("Petition") at 1).  Pursuant

to that judgment, petitioner was adjudicated a sex offender and

sentenced to three concurrent terms of six years' probation. Petitioner is currently at liberty, but remains subject to the terms of his probation.

For the reasons set forth below, I respectfully recommend that the petition be denied.

II.  Facts

    A.   Facts Giving Rise to
        Petitioner's Conviction

Petitioner's conviction arises from his sexual abuse of an N.W.,[1] an 11-year-old girl who was having her photographs taken in the store where petitioner worked.  The evidence offered at trial established the following facts.

On November 6, 2006, at 5:30 p.m., N.W. left her after-school program, located at 97th Street and Amsterdam Avenue (Tr.[2] 34-36).  She took a bus to 124th Street and St. Nicholas Avenue and walked to the photography store where petitioner was employed to have passport photographs taken (Tr. 346-49, 389-90).

_____

[1] Although petitioner refers to the victim by her full name in his filings, I shall refer to her by her initials in order to protect her privacy.

[2] "Tr." refers to the trial transcript; "S." refers to the transcript from the sentencing proceeding.

When N.W. entered the store, petitioner and "an old man" were present (Tr. 349, 361-62).  Petitioner took several photographs of N.W. sitting in front of white background (Tr. 350-51).  While he took the photographs, petitioner rubbed N.W.'s lips with his fingers and said "Pretty little girl, pretty little girl" (Tr. 350-51).  Petitioner showed N.W. the photographs he had taken on the digital camera's screen, and N.W. stated that she did not like them (Tr. 358-59, 408-09).

Petitioner then led N.W. to the back area of the store, which was separated from the front area of the store by a wall, where a gray background was set up (Tr. 360-61, 367).  By this time, the old man had left the store, and N.W. and petitioner were alone (Tr. 361-62).

Petitioner took several more photographs of N.W., which N.W. also stated that she disliked (Tr. 368).  Petitioner touched N.W.'s lips again (Tr. 351-55, 443-46).  Petitioner then squeezed N.W.'s breasts together and stated "You have to fix these" (Tr. 351-55, 443-46).  Petitioner also twice placed his hands on N.W's buttocks and pelvic area, over her clothing (Tr. 351-55, 443-51).  These actions caused N.W. to gasp (Tr. 362-63).  Petitioner then apologized, stating "I didn't mean to touch there" (Tr. 352).  Petitioner took one more picture of N.W., then led her to the front of the store (Tr. 362-64).  As N.W. walked to the front of

the store, another man entered the store carrying food and went to the rear of the store (Tr. 364-67).  N.W. stood at the front of the store while petitioner printed her photographs (Tr. 368-69).

N.W.'s mother, Odetta Hoppie, then arrived at the store (Tr. 369).  Hoppie had given N.W. money to purchase the passport photographs, and she had become nervous after being unable to reach N.W. on her cell phone (Tr. 459-61. 551-54).  When Hoppie asked N.W. what was taking so long, N.W. replied that she was waiting for the photographs to be printed (Tr. 463, 554-55).  Hoppie then asked N.W. how she was doing, to which N.W. replied that she was "[g]ood" but that "something happened" (Tr. 412-413, 464-65).  N.W. then demonstrated to Hoppie where petitioner had touched her, at which point Hoppie became enraged (Tr. 465-66).  Hoppie yelled at petitioner and threw a chair into the street (Tr. 466, 543-44).  At 5:53 p.m., Hoppie called the police and petitioner was arrested soon thereafter (Tr. 473).

B.   Petitioner's
     Defense

Petitioner testified in his own defense and offered a version of events that differed sharply from the prosecution's.

Petitioner testified that he lived with his wife in the Bronx, and had lived in the Bronx for approximately nine years (Tr. 735-37). He stated that he had immigrated to the United States from Yemen in 1997, and sent money back to his home country to support his relatives (Tr. 737). Petitioner testified that he had worked in the photography department of a pharmacy owned by Dr. Abdul Saleh's father for two years before relocating to the stand-alone photography shop, owned by Dr. Saleh himself, where the incident took place (Tr. 738-40). As of the date of the trial, petitioner stated that he had worked at the shop for seven years, seven days a week, and approximately nine hours each day (Tr. 740). He testified that he had never been arrested before the incident in question, nor had he had any other trouble with the law (Tr. 741). Petitioner stated that he would take between 30 and 40 sets of passport photographs every day (Tr. 744).

Petitioner testified that on the date of the incident, he was attending to a customer, who he later learned was Mr. Eudeka Taylor, when an old woman and a young girl, who he later learned was N.W., came into the store (Tr. 755). Petitioner stated that the old woman asked for a photocopy, which he provided (Tr. 755-56). Petitioner then asked N.W. if she needed assistance, and N.W. requested passport photographs (Tr. 756-

757).  Petitioner asked Taylor if he minded waiting while he took N.W.'s photographs, and Taylor replied that he did not (Tr. 756-57).

Petitioner led N.W. to an area of the store with a white background, across from the door, where passport photographs were taken (Tr. 757-59).  He testified that N.W. was wearing a winter coat over a Catholic school uniform that included a jacket (Tr. 759-60).  Petitioner stated that he took several photographs of N.W. in front of the white background (Tr. 760).  He stated that he showed N.W. the photographs on the viewing screen of the digital camera, but that N.W. said that she disliked them (Tr. 760).  Petitioner testified that he suggested to N.W. that the photographs might look better if she removed her winter coat (Tr. 760-61, 763).  On direct examination, petitioner stated that at no point did he ever touch N.W.'s winter coat (Tr. 761-62), but later admitted on cross-examination that he touched the coat near N.W.'s shoulder in a gesture intended to help her remove it (Tr. 815-22, 829-32).

Petitioner stated that he took several more photographs of N.W., but that N.W. disliked these photographs as well because her "head was not straight" (Tr. 760).  Petitioner testified that adjusted N.W.'s head several inches with his hands, touching her in the forehead-temple area (Tr. 765-66).  Petitioner stated that

6

he took several more photographs (Tr. 765-66, 811, 823), but that N.W. disliked these photographs as well (Tr. 765-67). Petitioner testified that he suggested to N.W. that the photographs might look better once they were printed, and that N.W.'s dissatisfaction might be due to the lack of clarity on the viewing screen of the digital camera (Tr. 766-67).

Petitioner testified that he never took N.W. to the area of the store with the gray background, because that area was used for studio photographs (Tr. 768).

Petitioner stated that he went behind the counter and began to develop the photographs of both N.W. and Taylor, who was still waiting, having remained in the store the whole time (Tr. 769-771). Petitioner testified that, by this time, Mr. Abdullah Ebrahim, petitioner's friend, was also present in the store (Tr. 771). Petitioner stated that developed Taylor's photographs first, and that Taylor then paid petitioner and left the store (Tr. 771). Petitioner testified that he then printed N.W.'s photographs, cut them, and showed them to her (Tr. 771-72). According to petitioner, N.W. told him that she did not like the photographs (Tr. 772). Petitioner testified that he told N.W. that she had to pay for the photographs, to which N.W. responded "I cannot pay you" (Tr. 772). Petitioner testified that he then told N.W. that if she did not pay him, then she would not receive

7

the photographs (Tr. 779).  At this, petitioner stated, N.W. crossed her arms and stood at the counter (Tr. 779).

Petitioner testified that soon after N.W. refused to pay for the photographs, a woman, who he later learned to be Odetta Hoppie, entered, speaking on a phone, and seemingly angry (Tr. 779-83).  Petitioner stated that Hoppie spoke briefly with N.W., and then accused him of touching N.W. (Tr. 784-85).

At no point, petitioner testified, was he ever alone with N.W. in the store, nor did he make any of the inappropriate statements N.W. ascribed to him (Tr. 785-86).

Several other witnesses also testified behalf of petitioner.  Mr. Eudeka Taylor, a 67-year-old man, testified that he was a regular patron of petitioner's store (Tr. 590-91). Taylor stated that, on the date of the incident, he had gone to petitioner's store to have photographs developed (Tr. 591). Taylor testified that along with himself and petitioner, an "elderly woman" and a "young girl" were in the store (Tr. 595). Taylor stated that he agreed to let petitioner take photographs of the young girl while he waited for his film to be developed (Tr. 595-96).  Taylor also stated that he saw petitioner accompany the young girl to an "open area" of the store where he took photographs of her (Tr. 598).  He stated that N.W. did not cry or ever attempt to speak to him, and that he noticed nothing

8

else unusual before paying for his photographs and leaving (Tr. 601-12).

Mr. Abdullah Ebrahim, a manager at petitioner's former place of employment, testified that he would often visit petitioner at the photography store (Tr. 637-40). On the date of the incident, Ebrahim testified that he had a dental appointment at 4:00 p.m., and that when the appointment ended he bought a sandwich and newspaper and went to visit petitioner at his store (Tr. 641-42, 651-52). Ebrahim stated that when he arrived at the store, a man and a girl were at the counter, and that he took a seat in the front of the store where he ate and read the newspaper (Tr. 642-43, 653-54). Ebrahim further stated that at some point, the man left the store, and that approximately ten minutes later, a woman showed up who accused petitioner of touching her daughter inappropriately (Tr. 644). Ebrahim stated that, in the ensuing fracas, he prevented the woman from striking petitioner with a chair (Tr. 644-46). Ebrahim testified that the girl never cried nor did she try to say anything to him (Tr. 643-44).

Dr. Abdul Saleh, the owner of the photography store, testified that petitioner worked for him and his family for approximately nine years (Tr. 712). He stated that petitioner would work seven days a week, from 10:00 a.m. to 7:00 p.m (Tr.

713).  Saleh further stated that the wall in the store had not changed since 2003, and the configuration of the store was unchanged after November 2006 (Tr. 719-23, 728-30).

Katia Rosario, a friend of petitioner's who worked nearby, testified that customers of her store would remark that petitioner was a good man (Tr. 681, 688, 695-96).

C.   The Prosecutor's
      Notation

One theory petitioner's counsel attempted to advance at trial was that N.W. fabricated the story of sexual abuse because she did not have the money her mother had given her to pay for the passport photographs and wanted to avoid her mother's anger (Petitioner's Memorandum of Law and Appendix in Support of His Petition for a Writ of Habeas Corpus, dated July 2010 (Docket Item 3)("Pet. Memo.), at 10-13).  Petitioner's counsel attempted to support this theory through the use of extrinsic evidence, in particular, a handwritten notation taken by the prosecutor during an interview with N.W. on January 17, 2007 that had been turned over pursuant to N.Y. Crim. Proc. L. § 240.45 and  People v. Rosario, 9 N.Y.2d 286, 173 N.E.2d 881, 213 N.Y.S.2d 448 (1961) (Pet. Memo. at 10).  The notation read "no $ for pics", which petitioner's counsel took to mean that N.W. had told the

10

prosecutor that she did not have money to pay for the photographs (Pet. Memo. at 10-13).

During cross-examination, petitioner's counsel asked N.W. whether she had money to pay petitioner for the passport photographs, to which N.W. responded that she did (Tr. 414). Petitioner's counsel then asked N.W. whether she remembered telling the prosecutor during the January interview that she did not have the money to pay for the photographs, to which petitioner responded that she had no such recollection (Tr. 414). Petitioner's counsel then attempted to show N.W. the prosecutor's "no $ for pics" notation to refresh her recollection (Tr. 414-15).  The Trial Court called a sidebar and asked the prosecutor whether she had any recollection as to whether N.W. told her that she did not have money for the photographs during the interview (Tr. 415-16).  The prosecutor stated that she had no recollection, but explained that she would sometimes write down questions that she intended to ask (Tr. 416-17).  The Trial Court stated that it would, nevertheless, allow petitioner's counsel to use the prosecutor's notes to refresh N.W.'s recollection (Tr. 417).

When cross-examination resumed, N.W. testified that she remembered meeting with the prosecutor (Tr. 418).  When shown the prosecutor's "no $ for pics" notation by petitioner's counsel and

asked whether she told the prosecutor during the interview that she did not have money, she stated "I did have money for pictures" (Tr. 419).  When the Trial Court re-posed the question to N.W., N.W. stated "I don't remember" (Tr. 420).

During a bench conference held at the conclusion of the day's proceedings, petitioner's counsel raised the possibility of calling the prosecutor as a witness to testify about the "no $ for pics" notation, and whether the prosecution would be amenable, in the alternative, to enter into a stipulation concerning the notation (Tr. 488-89).  The prosecutor reiterated her lack of recollection with respect to the notation (Tr. 489).  The Trial Court remarked that the notes were "kind of cryptic," and that the phrase "no $ for pics" could have multiple meanings (Tr. 489-90).  The Trial Court also noted that "no one seems to be suggesting that the [prosecutor's notes were] ever shown to [N.W.]," that N.W. never signed the notes, and that there was no evidence that N.W. ever "looked at [the notes] and affirmed [their] truth" (Tr. 490).  Petitioner's counsel responded "[t]hat's why I -- I can't impeach her with a prior written statement" (Tr. 490).  After questioning the prosecutor as to whether she had explored the issue of whether N.W. had ever returned the money to her mother, the Trial Court asked

petitioner's counsel what her application was, to which she

replied that she sought a stipulation from the prosecution that

>       there was an Assistant District Attorney that met with
>       the complaining witness, [N.W.], on January 17th as is
>       indicated on her notes, and that she recorded
>       statements that [N.W.] made, and that one of those --
>       her recordings -- was, in quotations "No $ for pics."

(Tr. 491).  The Trial Court stated that it would consider the

application over the weekend, but that it was "leaning against

it" and would "probably deny" it (Tr. 491-92).

When petitioner's trial resumed the following week, the

Trial Court again brought up the prosecutor's notation (Tr. 503).

The prosecutor stated that she would refuse enter into the

stipulation articulated by petitioner's counsel, and, under

penalty of perjury, affirmed to the Trial Court that she had no

recollection with respect to the "no $ for pics" notation (Tr.

504-05).  Petitioner's counsel argued that it was implausible

that the note recorded a question that the prosecutor intended to

ask N.W., given that many of the other phrases that appeared in

the prosecutor's notes were things that N.W. had testified to

(Tr. 507-09).  Because petitioner's counsel could not use the

notes to impeach N.W.'s testimony because she did not make them,

counsel reiterated her desire to enter into a stipulation with

the prosecution, or, in the alternative, to call the prosecutor

as a witness for the limited purpose of questioning her about the

13

notation (Tr. 507-09).  After additional colloquy, during which
it became clear that the prosecution would not enter into the
stipulation sought by the defense, petitioner's counsel discussed
several New York State cases concerning the use of prior
inconsistent statements to impeach witnesses, and argued that the
jury should be made aware of the "no $ for pics" notation as a
prior inconsistent statement of N.W. (Tr. 513-29).  Petitioner's
counsel further argued that the issue was not collateral, since
it related to N.W.'s motive to fabricate and also to the
existence of a material fact, namely, whether N.W. in fact had
the money to pay petitioner (Tr. 527-29).

        The Trial Court then ruled, prohibiting petitioner's
counsel from using the "no $ for pics" statement to impeach
N.W.'s testimony or to call the prosecutor as a witness (Tr. 532-
39).  Citing both New York State and federal authority, the Trial
Court stated that the because of the notation's vagueness, its
probative value was outweighed by its potential to prejudice the
prosecution's case and confuse the jury (Tr. 532-39).[3]

---

        [3] In pertinent part, the Trial Court stated

                With respect to the probative value of the
                statement, it may well be true, as [defense counsel]
                says, if indeed it was a statement with the content
                that [defense counsel] asserts it had by the
                complainant, that it was not collateral; but
                                                (continued...)

14

D.   Verdict and
     Post-Conviction
     <u>Proceedings</u>

On November 16, 2007, petitioner was convicted of three counts of sexual abuse in the second degree (Tr. 1033-34), and on January 4, 2008 he was sentenced to three concurrent terms of six years' probation and required to register as a sex offender (S. 16-18).

On appeal, petitioner argued, <u>inter</u> <u>alia</u>, that the Trial Court's refusal to allow his defense counsel to impeach N.W. with the prosecutor's "no $ for pics" notation denied him his right to a meaningful defense and violated the Confrontation Clause.  On December 29, 2009, the Appellate Term, First Department rejected petitioner's arguments, stating, in pertinent part:

---

[3](...continued)
notwithstanding, how exactly the statement is linked or would be linked by evidence in the record before the jury to the key credibility issues in the case still strikes me as very speculative and very uncertain.  The bottom line is that I think the proposed testimony would, you know if I were in the jury's shoes, leave me with a piece of evidence the significance of which was speculative and vague in the extreme and the probative value of which would be correspondingly extremely slight.

(Tr. 536).

15

> [W]e decline to disturb the trial court's determination
> to preclude defendant from introducing into evidence an
> ambiguous notation contained in the prosecutor's notes
> from the complainant's interview.  The court
> providently exercised its discretion in concluding that
> any probative value in admitting the notation as a
> purported "prior inconsistent statement" of the
> complainant was outweighed by the potential of causing
> jury speculation and confusion because the details of
> the notation were uncertain and susceptible to
> distortion (see People v Laboy, 202 AD2d 325 [1994], lv
> denied 83 NY2d 1005 [1994]).

People v. Al-Sabahi, 26 Misc. 3d 128(A), 906 N.Y.S.2d 781 (App.

Term 2009).  The New York State Court of Appeals denied leave to

appeal on April 8, 2010.  People v. Al-Sabahi, 14 N.Y.3d 838, 927

N.E.2d 565, 901 N.Y.S.2d 144 (2010).

Petitioner timely filed the pending petition on July

29, 2010 and raised a single issue:

> Whether [he] was deprived of his due process right
> to a fair trial, to present a defense and to confront
> the witness against him when the trial court
> incorrectly precluded defense counsel from impeaching
> the complainant, whose testimony constituted the sole
> evidence against him, about an important matter that
> related to her motive to fabricate.  U.S. Const.,
> Amends. IV, XIV.

(Petition at 2).

III.  <u>Analysis</u>

A.  <u>Standard of Review</u>

Before a federal court can issue a writ of habeas corpus, a petitioner must overcome a "difficult to meet[] . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." <u>Cullen v. Pinholster</u>, --- U.S. ---, ---, 131 S.Ct. 1388, 1398 (2011)(citations and internal quotation marks omitted).  Specifically, habeas relief may be granted only when the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;

28 U.S.C. § 2254(d).

The Supreme Court has explained the alternative standards set forth in subparagraph one as follows:

> First, we have explained that a decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  See also <u>Early v. Packer</u>, 537 U.S. 3, 7-8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (<u>per curiam</u>). . . .

Second, [petitioner] can satisfy § 2254(d) if he can demonstrate that the [State] Court's decision involved an "unreasonable application" of clearly established law.  As we have explained:

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.  See Bell v. Cone, 535 U.S. 685, 698-699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Williams, supra, at 411, 120 S.Ct. 1495.  Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner."  Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).

Price v. Vincent, 538 U.S. 634, 640-41 (2003); accord Waddington v. Sarausad, 555 U.S. 179, 190 (2009); Brown v. Payton, 544 U.S. 133, 141 (2005); see also Lockyer v. Andrade, 538 U.S. 63, 70-72 (2003); Bierenbaum v. Graham, 607 F.3d 36, 47-48 (2d Cir. 2010); Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006); Hawkins v. Costello, 460 F.3d 238, 242-43 (2d Cir. 2006); Brown v. Artuz, 283 F.3d 492, 500-01 (2d Cir. 2002).

In addition to the definition of "unreasonable application" set forth above, a state court may unreasonably apply Supreme Court precedent "if the state court unreasonably extends a legal rule established by the Supreme Court or if it unreasonably fails to extend a legal rule to a context in which the rule reasonably should apply."  Serrano v. Fischer, 412 F.3d 292, 296-97 (2d Cir. 2005).  "Unreasonableness is determined by

an 'objective' standard." Gersten v. Senkowski, 426 F.3d 588,
607 (2d Cir. 2005), quoting Williams v. Taylor, 529 U.S. 362, 409
(2000); Hawkins v. Costello, supra, 460 F.3d at 242-43.

Both the "contrary to" and "unreasonable application"
clauses "restrict[] the source of clearly established law to [the
Supreme] Court's jurisprudence." Williams v. Taylor, supra, 529
U.S. at 412; accord Parker v. Matthews, --- U.S. ---, ---, 132
S.Ct. 2148, 2155-56 (2012).  "[C]learly established [f]ederal law
. . . refers to the holdings, as opposed to the dicta, of th[e]
Court's decisions as of the time of the relevant state-court
decision." Carey v. Musladin, 549 U.S. 70, 74 (2006) (internal
quotation marks omitted); accord Thaler v. Haynes, --- U.S. ---,
---, 130 S.Ct. 1171, 1173 (2010) ("A legal principle is 'clearly
established' within the meaning of this provision only when it is
embodied in a holding of this Court."); see Greene v. Fisher, 132
S.Ct 38, 44 (2011).  "That federal law, as defined by the Supreme
Court, may be either a generalized standard enunciated in the
[Supreme] Court's case law or a bright-line rule designed to
effectuate such a standard in a particular context." Kennaugh v.
Miller, 289 F.3d 36, 42 (2d Cir. 2002); accord Davis v. Grant,
532 F.3d 132, 140 (2d Cir. 2008).  "A petitioner can not win
habeas relief solely by demonstrating that the state court
unreasonably applied Second Circuit precedent." Yung v. Walker,

19

341 F.3d 104, 110 (2d Cir. 2003); accord DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002).

A ruling that is clearly erroneous is not necessarily a ruling that constitutes an unreasonable application of federal law. Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (The "objectively unreasonable" and "clear error" standards "are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008); Cotto v. Herbert, 331 F.3d 217, 248 (2d Cir. 2003). However, "'the increment [of error beyond clear error] need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Brisco v. Ercole, 565 F.3d 80, 88 (2d Cir. 2009), quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).

To be entitled to the deferential standard of review under either sub-paragraph of subsection 2254(d), the state courts must have resolved the petitioner's claims "on the merits." Cotto v. Herbert, supra, 331 F.3d at 230; see also Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002) ("[I]n order for this deferential standard of § 2254 to apply, we must first determine that the state court considered [petitioner's claim] on its

merits."); <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 309-10 (2d Cir. 2001).

The Second Circuit has instructed habeas courts to "classify" a state court decision as either:  (1) "fairly appearing to rest primarily on federal law or to be interwoven with federal law"; or (2) "fairly appearing to rest primarily on state procedural law." <u>Jimenez v. Walker</u>, 458 F.3d 130, 145 (2d Cir. 2006).  "If the state court's decision falls into the first category, and does not 'contain a clear statement of reliance on a state procedural bar,' the decision must be treated as having been made on the merits." <u>Mateo v. Fishkill Corr. Fac.</u>, No. CV-04-3420 (DGT), 2007 WL 2362205 at *5 (E.D.N.Y. Aug. 14, 2007), <u>quoting</u> <u>Jimenez v. Walker</u>, <u>supra</u>, 458 F.3d at 138.  To make this classification, courts in this circuit examine "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." <u>Jimenez v. Walker</u>, <u>supra</u>, 458 F.3d at 145 n.16.

Here, upon examining these three factors, I conclude that the Appellate Term adjudicated the merits of petitioner's due process right to a fair trial and Confrontation Clause claims when it found that the Trial Court "providently exercised its discretion in concluding that any probative value in admitting the notation as a purported 'prior inconsistent statement' of the

complainant was outweighed by the potential of causing jury speculation and confusion because the details of the notation were uncertain and susceptible to distortion."  People v. Al-Sabahi, supra, 26 Misc. 3d 128(A), 906 N.Y.S.2d 781.  Although the language is slightly conclusory, it does address the substance of petitioner's claim and does not remotely suggest that the decision rests on a procedural basis.  My conclusion is not altered by the fact that the Appellate Term did not explicitly refer to the Fourteenth Amendment, or relevant federal case law.  See Sellan v. Kuhlman, supra, 261 F.3d at 312  (noting that a state court decision may be deemed on the merits "even if the state court does not explicitly refer to . . . relevant federal case law"); Cheng Kang Shi v. Connolly, 06 CV 2093 (NG)(RLM), 2007 WL 4380276 at *6 (E.D.N.Y. Dec. 13, 2007) ("AEDPA's deferential standard of review applies even if the state court did not explicitly refer to either the federal claim or to relevant federal case law.")(internal quotation marks omitted).

Because the Appellate Term adjudicated petitioner's due process and Confrontation Clause claims on the merits, the Appellate Term's decision on this claims are entitled to the deferential standard of review set forth in 28 U.S.C. § 2254(d).

B.    Merits of
      Petitioner's Claim

State court rulings on evidentiary matters implicate only state law and "are not reviewable by a habeas court unless the errors alleged are so prejudicial as to constitute fundamental unfairness." Rosario v. Kuhlman, 839 F.2d 918, 924-25 (2d Cir. 1988); Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983)("Erroneous evidentiary rulings do not automatically rise to the level of constitutional error . . . . Rather, the writ [of habeas corpus] would issue only where petitioner can show that the error deprived her of a fundamentally fair trial."), citing Chambers v. Mississippi, 410 U.S. 284, 302-03 (1973)(emphasis in original).

To determine whether an allegation of trial court error rises to the level of a constitutional violation, "the Court must [first] consider whether the evidentiary ruling was proper under state law, and if not, whether the error deprived petitioner of a fundamentally fair trial." Nowlin v. Greene, 467 F. Supp. 2d 375, 378-81 (S.D.N.Y. 2006)(Holwell, D.J.); see also Perez v. Phillips, 210 F. App'x 55, 57-58 (2d Cir. 2006)("[To determine] [w]hether the improper evidentiary ruling was an error of constitutional magnitude . . . . we examine '(1) whether the [improper]

23

exclusion [of evidence] was error under state law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial."), quoting Dey v. Scully, 952 F. Supp. 957, 969 (E.D.N.Y. 1997).

> Under New York law, "a trial court is permitted wide latitude in ruling on the scope of cross-examination and its ruling is not to be disturbed on appeal absent abuse of discretion." Bush v. Portuondo, No. 02-CV-2883 (JBW), 03-MISC-0066 (JBW), 2003 WL 23185751, at *14 (E.D.N.Y. Oct. 29, 2003) (citing People v. Schwartzman, 24 N.Y.2d 241, 244, 299 N.Y.S.2d 817, 247 N.E.2d 642 (1969); see also People v. Sorge, 301 N.Y. 198, 201-02, 93 N.E.2d 637 (1950).

Nightengale v. Conway, 05-CV-1994 (GBD)(THK), 2009 WL 995178 at *12 (S.D.N.Y. Apr. 13, 2009) (Daniels, D.J.) (adopting Report & Recommendation of Katz, M.J.).

> Since evidence of inconsistent statements "is often collateral to the ultimate issue before the [trier of fact] and bears only upon the credibility of the witness, its admissibility is entrusted to the sound discretion of the Trial Judge" (People v Duncan, 46 NY2d at 80). Indeed, "[i]t is well established that the trial courts have broad discretion to keep the proceedings within manageable limits and to curtail exploration of collateral matters" (People v Hudy, 73 NY2d 40, 56 [1988]). However, "the trial court's discretion in this area is circumscribed by the defen-dant's constitutional rights to present a defense and confront his accusers" (id. at 57, citing Davis v Alaska, 415 US 308 [1974]; see Chambers v Mississippi, 410 US 284 [1973]; Washington v Texas, 388 US 14 [1967]; Pointer v Texas, 380 US 400 [1965]; People v Gissendanner, 48 NY2d 543, 546 [1979]). Thus, while a trial court may preclude impeachment evidence that is speculative, remote, or collateral, "[that] rule . . . has no application where the issue to which the evi-dence relates is material in the sense that it is relevant to the very issues that the [trier of fact]

> must decide" (<u>People v Knight</u>, 80 NY2d 845, 847
> [1992]).  In other words, there is no risk of diver-
> sionary excursions into collateral matters where "[t]he
> substance of th[e] contradiction goes to a material,
> core issue in the case" (<u>People v Cade</u>, 73 NY2d 904,
> 905 [1989]; <u>see</u> <u>People v Wise</u>, 46 NY2d 321, 327-328
> [1978]).

<u>People v. Bradley</u>, 99 A.D.3d 934, 936-37, 952 N.Y.S.2d 260,

263-65 (2d Dep't 2012).

Here, the Trial Court's exclusion of the prosecutor's

notation was neither an erroneous application of New York law nor

did it deprive the petitioner of the right to a fundamentally

fair trial.

With respect to New York law, the cases cited above

make clear that trial courts have the broad discretion to exclude

impeachment evidence that is speculative and remote, and, as the

Trial Court correctly noted, the prosecutor's notation was highly

speculative in both origin and meaning.  It was unclear whether

the phrase "no $ for pics" was written by the prosecutor in

response to something that N.W. had told her or whether it

signified a question that the prosecutor intended to ask N.W.

Although the former possibility seems the more likely of the two,

the danger of allowing petitioner's counsel to impeach N.W. with

a statement not her own was a significant possibility.  <u>See</u>

<u>People v. Reed</u>, 257 A.D.2d 474, 475, 685 N.Y.S.2d 2 (1st Dep't

1999) ("The court properly precluded admission of the complaint

report as a prior inconsistent statement, since the hearsay document contained composite descriptions, not attributable to any specific witness."); People v. Covington, 209 A.D.2d 713, 714, 619 N.Y.S.2d 333 (1st Dep't 1994); People v. Stevenson, 266 A.D.2d 68, 698 N.Y.S.2d 466 (1st Dep't 1999)("The court properly exercised its discretion in precluding defendant from introducing into evidence two purported prior inconsistent statements of the complainant.  Under the circumstances surrounding each document, the alleged inconsistency could not be attributed to the complainant."); People v. Santiago, 33 A.D.3d 448, 449, 823 N.Y.S.2d 16 (1st Dep't 2006).

However, even if the notation did reflect something that N.W. told the prosecutor, it is unclear how faithfully and accurately it was transcribed, or even precisely what its meaning was.  Indeed, the notation "no $ for pics" consists of only four words, two of which are shorthand, and is subject to numerous plausible interpretations.  For instance, it could signify that N.W. did not have money to pay for the photographs, as petitioner's counsel suggested.  It could also signify that N.W. refused to pay for the photographs because she was dissatisfied with them, as petitioner testified.  Or it could signify that no money was ever exchanged before petitioner's arrest.  Again, while certain interpretations are, perhaps, more plausible than

others, the notation is not so unambiguous as to permit only one reasonable interpretation of its possible meaning, and, in light of this fact, the Trial Court was not unreasonable in determining that the notation was "uncertain and susceptible to distortion." People v. Laboy, 202 A.D.2d 325, 609 N.Y.S.2d 211 (1st Dep't 1994) ("The court's preclusion of impeachment by means of a 'prior inconsistent statement', the details of which were uncertain and susceptible to distortion, was an appropriate exercise of discretion."); see also People v. Duncan, 46 N.Y.2d 74, 81, 385 N.E.2d 572, 577, 412 N.Y.S.2d 833, 838 (1978) ("As the witness could not testify to the statement with any degree of precision or specificity, its probative value was negligible and was properly excluded.").

Petitioner's suggestion that the notation was admissible as extrinsic evidence of N.W.'s motive to lie about petitioner's conduct is also problematic.  Even assuming that the notation meant that N.W. had no money because she had spent it on other things, the notion that she would then falsely accuse petitioner of sexual abuse solely to divert attention from that fact is highly speculative.  "While extrinsic proof tending to establish a motive to fabricate is never collateral and may not be excluded on that ground, when the evidence is too remote or speculative of a motive to fabricate, the trial court may, in its

discretion, exclude such proof." <u>People v. Garcia</u>, 47 A.D.3d 830, 831, 849 N.Y.S.2d 637, 638 (2008).

Finally, it must also be noted that, despite the fact that the Trial Court did not permit the "no $ for pics" notation to be placed before the jury, no other restrictions were imposed on petitioner's counsel ability to explore the theory that N.W. did not have money to pay petitioner for the photographs. Indeed, petitioner's counsel was permitted to cross-examine N.W. about this very issue, even showing N.W. the "no $ for pics" notation in an attempt to refresh her recollection (Tr. 414-15, 418-20).  Petitioner's counsel also attacked N.W.'s credibility in other ways, including questioning N.W. about a MySpace profile with her photograph that contained false information about her age and racy comments[4] (Tr. 422-433).  In short, any prejudice that petitioner's defense supposedly suffered by being prevented from introducing the notation to the jury was more than counter-balanced by the other opportunities afforded to impugn N.W.'s credibility.  <u>See</u> <u>People v. Jackson</u>, 29 A.D.3d 400, 401, 814 N.Y.S.2d 164 (1st Dep't 2006); <u>People v. Santiago</u>, 303 A.D.2d 321, 757 N.Y.S.2d 269 (2003); <u>People v. Stevenson</u>, 266 A.D.2d 68, 698 N.Y.S.2d 466 (1999).

---

[4] The comments on N.W.'s Myspace profile included "I am that queen with attitude" (Tr. 430), "What's your mood? Hot" (Tr. 431).

Accordingly, for all of the reasons discussed above, I cannot conclude that the Trial Court erroneously applied New York law by declining to allow petitioner to impeach N.W. with the prosecutor's "no $ for pics" notation.  However, even assuming, _argendo_, that the Trial Court's ruling was improper under New York law, petitioner is still unable to demonstrate that the exclusion of the "no $ for pics" notation from evidence deprived him of a fundamentally fair trial, or violated any of his other Constitutional rights.

Under federal law, the Court may not grant habeas relief unless the improperly excluded evidence, "viewed objectively in the light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.  In short, it must have been 'crucial, critical, highly significant.'"  Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985), quoting Nettles v. Wainright, 677 F.2d 410, 414-15 (5th Cir. 1982); see also United States v. Agurs, 427 U.S. 97, 112 (1976)(enunciating the above referenced standard as the "proper standard of materiality").

> The right to present a defense is "one of the minimum essentials of a fair trial." Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988), quoting Chambers, 410 U.S. at 294.  Although the right to present a defense includes the right to submit evidence "to contradict or explain the opponent's case," Taylor

29

v. Illinois, 484 U.S. 400, 410-11, 108 S.Ct. 646, 98
L.Ed.2d 798 (1988), this right is not unlimited; a
trial court may place restrictions on a defendant's
presentation of evidence without offending the Consti-
tution, so long as those restrictions serve "'legiti-
mate interests in the criminal trial process' . . . and
are not 'arbitrary or disproportionate to the purposes
they are designed to serve.'" United States v.
Almonte, 956 F.2d 27, 30 (2d Cir. 1992), quoting Rock
v. Arkansas, 483 U.S. 44, 55-56, 107 S.Ct. 2704, 97
L.Ed.2d 37 (1987).  Furthermore, the Supreme Court has
been reluctant to impose restraints on ordinary eviden-
tiary rulings by state courts, as the "power of courts
to exclude evidence through the application of eviden-
tiary rules . . . serve[s] the interests of fairness
and reliability." Zarvela v. Artuz, 364 F.3d 416, 418
(2d Cir. 2004), quoting Wade v. Montello, 333 F.3d 51,
58 (2d Cir. 2003).  See Almonte, 956 F.2d at 30 (deny-
ing defendant "carte blanche to circumvent the rules of
evidence" by invoking the right to present a defense).
Thus, the relevant inquiry for the habeas court is
whether "the excluded testimony was material to the
presentation of the defense so as to deprive the defen-
dant of fundamental fairness." Rosario, 839 F.2d at
924.

Watkins v. Perez, 05 Civ. 477 (GEL), 2007 WL 1344163 at *19

(S.D.N.Y. May 7, 2007) (Lynch, then D.J., now Cir. J.).

Where an erroneous evidentiary ruling is made and
relevant evidence is excluded, it is the reviewing
court's duty to determine whether the excluded evidence
was material to the presentation of the defense.
Rosario, 839 F.2d at 925; Taylor, 708 F.2d at 891.  If
the excluded evidence created a reasonable doubt that
did not otherwise exist, a constitutional error was
committed and the omission must be evaluated in the
context of the entire record.  Rosario, 839 F.2d at 924
(citing United States v. Agurs, 427 U.S. 97, 112-13, 96
S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

Seabrook v. Lee, 11-CV-4449 (KAM), 2012 WL 6720737 at *7
(E.D.N.Y. Dec. 27, 2012); see also Youngblood v. Brown, 465 F.
Supp. 2d 270, 279 (S.D.N.Y. 2006) (Chin, then D.J., now Cir. J.).

      Here, petitioner is unable to demonstrate that the
prosecutor's four-word "no $ for pics" notation was critical to
the presentation of his defense.  First, for the reasons stated
above, the ambiguity of the notation as to its origin and its
meaning would have undermined much of the supposed persuasiveness
petitioner ascribes to it.  Second, even if the jury were to
accept petitioner's interpretation of the notation, the inference
that petitioner expected the jury to draw, that not having money
motivated N.W. to falsely accuse petitioner of sexual abuse, is
highly speculative and perhaps even counterintuitive.  Third,
petitioner's counsel was not prohibited from questioning N.W.
about whether she had money and about what she remembered from
her meeting with the prosecutor, negating any contention that
petitioner was prevented from pursuing this defensive strategy.
Finally, evidence was elicited during trial that, in the view of
this Court, was much more harmful to N.W.'s credibility than the
notation would have been, inter alia:  (1) N.W.'s inability to
identify petitioner in court (Tr. 350), (2) N.W.'s admission of
lying to her teachers and her mother in the past (Tr. 343-44),
(3) N.W.'s difficulty explaining her MySpace profile (Tr. 422-

33), and (4) N.W.'s extremely condensed time-frame of the events at issue.[5]  Given that the jury was presented with much more damaging evidence with respect to N.W.'s credibility and <u>still</u> believed her testimony, I cannot conclude that there is any reasonable likelihood that the admission of the prosecutor's notation would have altered the trial's outcome. Thus, in light of the foregoing, I conclude that the admission of the prosecutor's notation into evidence would not have created a reasonable doubt that did not otherwise exist.

To the extent petitioner attempts to frame his argument as a violation of the Confrontation Clause, it is also unpersuasive.  Petitioner's Memorandum of Law provides extensive discussion of the facts of the case, but is wholly lacking in citation to, and analysis of, pertinent federal Confrontation Clause authority.  Petitioner states that the Trial Court's exclusion of the prosecutor's notation from evidence "was clearly an unreasonable application of the Supreme Court's precedent in <u>Crane</u>, <u>Chambers</u>, <u>Van Arsdall</u> and <u>Davis</u>," (Pet. Memo. at 36) but provides virtually no discussion of the facts or holdings of these Supreme Court cases.  Oddly, petitioner devotes considerable attention to

---

[5] According to N.W., the entire sequence of events -- including her traveling by bus for more than twenty blocks -- would have had to take place between when she left her after-school program at 5:30 p.m. and when her mother called the police at 5:53 p.m.

Ellsworth v. Warden, 318 F.3d 285 (1st Cir. 2003) (Pet. Memo. at 30), a decision in which a panel of the First Circuit held that a habeas petitioner's Confrontation Clause rights were violated by the trial court's refusal to allow certain cross-examination of an 11-year-old complaining witness, but neglects to mention that the opinion was withdrawn and superseded by an en banc decision that reached the opposite conclusion.  See Ellsworth v. Warden, 333 F.3d 1 (1st Cir. 2003) (en banc).  In any event,

> "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis omitted).  A trial judge retains "wide latitude" to restrict cross-examination "based on concerns about, among other things, harassment, preju-dice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431; see also Watson v. Greene, 640 F.3d 501, 510 (2d Cir. 2011) (the "decision to restrict cross-examination will be reversed only when the court has abused its broad discretion" (internal quotation marks omitted)).  "To determine the propriety of cross-examination, as with other determinations of admissibility of evidence, courts balance prejudice versus probative value." Watson, 640 F.3d at 510.

Corby v. Artus, 699 F.3d 159, 166 (2d Cir. 2012) cert. denied, 133 S. Ct. 1287 (U.S. 2013); see also Grant v. Demskie, 234 F.3d 1262 (2d Cir. 2000).  Here, for the reasons discussed above, the "no $ for pics" notation, even if relevant, was ambiguous, and presented a real risk of jury confusion.  The Trial Court's

decision to restrict its use, after balancing the notation's probative value versus its potential to cause prejudice, was well within the "wide latitude" afforded to trial courts in making such evidentiary rulings, Delaware v. Van Arsdall, supra, 475 U.S. 673, 679, and petitioner's counsel was otherwise free to question N.W. about whether or not she had the money to pay petitioner.  Thus, petitioner's rights under the Confrontation Clause were not violated.

Finally, to the extent petitioner argues that he should have been entitled to call the prosecutor as a witness (Pet. Memo. at 33), his argument is without merit.  With respect to New York law, the "decision to allow the defense to call the prosecutor as a witness rests in the sound discretion of the trial court."  People v. Paperno, 54 N.Y.2d 294, 302-03, 429 N.E.2d 797 (1981).  Given that the testimony petitioner sought to elicit from the prosecutor concerned a piece of evidence that the Trial Court had already determined was inadmissible to impeach N.W.'s testimony and the prosecutor's sworn statement that she did not recall whether the notation reflected a question or a statement from N.W., it is hard to see how precluding the prosecutor's testimony was anything other than a sound exercise of the Trial Court's discretion.  Perhaps the most fundamental defect of this particular claim, however, is petitioner's inability to cite any

clearly established Federal case law on point.[6]  This, by itself,
is fatal to his habeas corpus argument.

Thus, for the reasons stated above, petitioner is
unable to demonstrate that the Trial Court's refusal to allow him
to introduce the prosecutor's "no $ for pics" notation into
evidence, either directly or through the testimony of the prose-
cutor, violated New York State law or any of his Constitutional
rights.

IV.  <u>Conclusion</u>

Accordingly, for all the foregoing reasons, I respect-
fully recommend that the petition be denied in all respects.

In addition, because petitioner has not made a substan-
tial showing of the denial of a constitutional right, I also
recommend that a certificate of appealability not be issued.  28
U.S.C. § 2253.  To warrant the issuance of a certificate of
appealability, "petitioner must show that reasonable jurists
could debate whether . . . the petition should have been resolved
in a different manner or that the issues presented were adequate
to deserve encouragement to proceed further."  <u>Middleton v.</u>

---

[6] In support of this argument, petitioner cites only to
<u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 56 (1987) for the general
proposition that defendants have "the right to put before a jury
evidence that might influence the determination of guilt." (Pet.
Memo. at 33).

Attorneys Gen., 396 F.3d 207, 209 (2d Cir. 2005) (per curiam) (citation and internal quotation marks omitted); see also Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005) (per curiam). For the reasons set forth above, I conclude that there would be no difference of opinion among reasonable jurists that petitioner's federal rights were not violated.

I further recommend that certification pursuant to 28 U.S.C. § 1915(a)(3) not be issued because any appeal from this Report and Recommendation, or any Order entered thereon, would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438, 445 (1962).

V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. See also Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Deborah A. Batts, United States District Judge, 500 Pearl Street, Room 2510, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge

Batts.   FAILURE TO OBJECT *WITHIN FOURTEEN* (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v.Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-238 (2d Cir. 1983).

Dated:  New York, New York
        May 7, 2013

                              Respectfully submitted,


                              HENRY PITMAN
                              United States Magistrate Judge


Copies mailed to:

Paul Wiener, Esq.
The Legal Aid Society
199 Water Street
5th Floor
New York, New York  10038

Alyson J. Gill, Esq.
New York State Attorney General
120 Broadway, 12th Floor
New York, New York  10271